### UNITED STATES v. AH SOU.

(District Court, D. Washington, N. D.    July 13, 1904.)

#### No. 2,628.

1. ALIENS—CHINESE PERSONS—MARRIAGE.

   Where a Chinese female was brought into the United States for immoral purposes, and after her escape was married to a Chinese inhabitant who was registered as a Chinese laborer, but it was questionable whether the parties regarded such marriage as bona fide, it was no defense to deportation proceedings.

2. SAME—SLAVERY—CONSTITUTIONAL LAW.

   Where a Chinese female was sold as a slave in China, and her master, with the assistance of other Chinamen, brought her into the United States for immoral purposes, and after her escape she was cared for at a church home for Chinese women, and it appeared that a decree of deportation would be equivalent to remanding her to perpetual slavery and degradation, she was entitled to her discharge, under Const. U. S. Amend. 13, providing that neither slavery nor involuntary servitude, except as a punishment for crime, whereof the party shall have been duly convicted, shall exist within the United States.

Hearing on appeal from an order by a United States Commissioner for the deportation of a Chinese woman who was imported into the United States as a slave in violation of the immigration laws. Order vacated and prisoner discharged.

Jesse A. Frye, U. S. Atty.

Roger S. Greene and John P. Hartman, for appellant.

HANFORD, District Judge. From the evidence in this case, I find that the appellant is a Chinese woman; that she was sold as a slave by her foster mother, in China, and was by her purchaser, with the assistance of another Chinaman, brought into the United States for immoral purposes. They were successful in imposing upon the immigration

¶ 1. Citizenship of the Chinese, see notes to Gee Fook Sing v. United States, 1 C. C. A. 212; Lee Sing Far v. United States, 35 C. C. A. 332.

officers by means of false representations, and skillful use of photographs identifying 'the girl as a daughter of the accomplice, and a native of this country. By beatings and abuse, her master compelled her to earn money for him as a prostitute, until she escaped, and took refuge in the Chinese Women's Home of the Presbyterian Church, in the city of Portland, where she lived for a time, and was there married to a Chinese inhabitant of this country, who is registered as a Chinese laborer. The marriage ceremony was performed by a minister of the gospel, and formal compliance with the laws of Oregon with respect to the solemnization of marriages is shown by the uncontradicted evidence of trustworthy witnesses; but the marriage has not been consummated by cohabitation, and it appears to be questionable whether the parties themselves regard it as bona fide, or only a mere pretense creating no binding obligation. The woman was not contented in the home, and she solicited the man to marry her and become her protector. He was reluctant, and, by his testimony, he appears to be uncertain whether he is in fact the woman's husband.

If it were proved by satisfactory evidence that the appellant's marriage was bona fide, and if her legal husband were a Chinese person of the privileged class, or a citizen of the United States, she would be lawfully entitled to dwell in this country. United States v. Gue Lim (D. C.) 83 Fed. 136; Id., 176 U. S. 459, 20 Sup. Ct. 415, 44 L. Ed. 544; Hopkins v. Fachant (C. C. A.) 130 Fed. 839. The evidence, however, is not sufficient to make it clear to my mind that the case comes within any rule of law established by either of the cases cited.

The case is unique and perplexing. The laws excluding Chinese immigrants and women imported for immoral purposes require the court to cause a person in the situation of the appellant to be deported to China. Compliance with the statute in this case will be, in my estimation, a barbarous proceeding, for it will be equivalent to remanding the appellant to perpetual slavery and degradation. If sent back to her own country, where she was by her own kindred sold to a cruel master, she must abandon hope; and it is shocking to contemplate that the laws of our country require the court to use its process to accomplish such an unholy purpose. On the other hand, it is proper to consider that, as an outcome of a bloody civil war, the people of the United States, by the thirteenth amendment to the Constitution of the United States, ordained that "neither slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States or any place subject to their jurisdiction." This article is part of the supreme law of this land, by which all branches of the government must be controlled. It is a guaranty of liberty, and a vital principle of our government, to secure which the people of this nation did not hesitate to sacrifice their most priceless treasures. It is not a mere abstract theory of liberty, impotent when subjected to the test of a practical application to the case of a helpless victim of oppression, but a mandate from the highest authority, requiring the exercise of all the force necessary for the protection of the liberty of any and every individual whose right to liberty has not been forfeited by conviction of crime. The effort which the appellant has made to escape from thraldom and to rise from her condition of degradation

entitles her to humane consideration, and, because I can see no other way in which to emancipate her from actual slavery, I direct that an order be entered vacating the order for her deportation, and that she be discharged from custody, in order that she may have such protection as may be afforded by the friendly agencies which have intervened in her behalf, and the laws of this country.

---

### THE SURF.

#### (District Court, S. D. New York. October 8, 1904.)

1. COLLISION—DEFENSE OF INEVITABLE ACCIDENT.

To exonerate a vessel from liability for a collision on the ground of inevitable accident, it must have occurred without any fault on her part, and notwithstanding the exercise of due care and a proper degree of nautical skill.

2. SAME—STEAM VESSELS MEETING—WRONG POSITION OF VESSEL IN RIVER.

A steam yacht was proceeding westward through Hell Gate so near the shore that she was compelled to sheer out in order to pass other vessels, when her bow was caught by the flood tide, and she was unable to avoid collision with a meeting tug having two tows, which was 500 feet out from shore, and on her proper course to pass in accordance with their agreement by signal. *Held*, that the collision was not the result of inevitable accident but of negligent navigation of the yacht in the beginning and that she was liable for the resulting injury.

In Admiralty. Suit for collision.

James J. Macklin, for libelant.

Black & Kneeland, for claimant.